## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| MALISSA JO DAVIS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | No. 17-cv-3173 |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Malissa A. Davis appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Davis filed a Motion for Summary Judgment (d/e 14).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 19).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 22, 2017 (d/e 10). For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Davis was born on June 22, 1977. She completed high school and took special education classes while in school. She previously worked as a cook. Davis suffers from degenerative disc disease in her cervical and lumbar spine with radiculopathy; carpal tunnel syndrome; osteoarthritis; and status post carpal tunnel release surgery, post lumbar fusion surgery at L4-5, L5-S1, and post cervical fusion surgery at C5-6. Certified Transcript of Proceedings Before the Social Security Administration (d/e 12) (R.) 20, 26, 234-35.[1]

Davis has not engaged in substantial gainful activity since May 25, 2011. She filed an application for Disability Benefits on November 29, 2011. On September 30, 2013, an Administrative Law Judge (prior ALJ) issued a decision denying her claim. On January 13, 2014, Davis filed a second claim. This second claim is currently before the Court for review. Davis again alleged that she became disabled on May 25, 2011. The prior ALJ's decision, however, resolved her claim through the date of the decision, September 30, 2013. R. 17. This case, therefore, concerns whether Davis was disabled after September 30, 2013.

---

[1] Radiculopathy is a disease of the nerve roots such as inflammation or impingement of the nerve roots. Dorland's Illustrated Medical Dictionary (32ᵈ ed. 2012) (Dorland's), at 1571.

On May 3, 2010, Davis saw nurse practitioner Amber Drumeller, NP, for swelling in her legs and fingers.  On examination, Davis had lower back pain on palpation.  Davis had full range of motion in all joints.  Drumeller observed slight swelling in legs and fingers.  Drumeller assessed lower back pain, arthralgias, and edema present.  Drumeller changed Davis' medication. R. 386.

On June 25, 2010, Davis saw orthopedic nurse practitioner Jennifer Nichelson, FNP-BC.  Davis reported that she experienced ongoing back pain for four years.  Nichelson noted that in 2007, Dr. Timothy VanFleet, M.D., had performed a lumbar fusion at L4-5, L5-S1 with instrumentation on Davis' lumbar spine.  Davis said she did not "quite recover" from the surgery.  She reported that she continued to have back and leg pain.  Davis reported that she tried epidural injections and a spinal stimulator without much success. She said that Dr. VanFleet told her he could not do anything else for her.  On examination, Davis arose slowly from a seated position. She had normal heel-toe gait with equal strength in her bilateral lower extremities.  Straight leg raising caused pain.  She had tenderness in her lower back.  Nichelson noted that imaging studies showed a two-level fusion at L4-5 and L5-S1.  Nichelson stated that the studies did not show

any significant nerve impingement or stenosis. R. 456. Nichelson recommended against any additional surgery. R. 456-57.

On March 9, 2011, Davis saw primary care nurse practitioner Michael King, NP, for lower back pain. Davis reported that Dr. VanFleet performed back surgery on her, but told her there was nothing more that could be done surgically. King assessed lower back pain and cervicalgia. King prescribed an NSAID pain reliever meloxicam and a muscle relaxer cyclobenzaprine (Flexeril). R. 381.

On August 23, 2011, physical therapist Todd Thorsen, M.S., OTR/L, completed a Functional Capacity Evaluation of Davis for her former employer. Thorsen opined that Davis functioned "at the light level of the Physical demand level of work." Thorsen recommended that she not return to her prior job because the light work level was below her "job task criteria." R. 711.

Thorsen stated that Davis reported that she could sit for 30 minutes and stand for 30 minutes. On examination, Davis walked with a limp. She had positive straight leg raising at 90 degrees while sitting and at 30 degrees while supine. She had decreased range of motion in her lumbar spine. Her lower extremity strength was 5/5 bilaterally. Davis' squatting, bending, kneeling, and crawling were "slow and labored." Davis could

reach overhead without difficulty. Based on lifting and carrying tests, Thorsen opined that Davis could occasionally lift 7.5 pounds from floor to waist and 12.5 pounds from waist to shoulder. He opined that she could not frequently lift objects from floor to waist, and could frequently lift 8 pounds from waist to shoulder. He opined that Davis could occasionally carry 5 pounds and could not frequently carry objects of any weight. He stated that Davis rated her pain at 8/10 after these tests. R. 712.

On June 19, 2012, Davis saw primary care nurse practitioner Amber Wright, FNP-BC. Davis reported that the night before Mother's Day she fell while stepping up onto a step stool. She had pain in her lower back radiating into the right ribcage and right hip. On examination, Davis' lower back was tender to palpation, which tenderness radiated to the ribcage. Davis appeared slightly stiff with movement. Wright prescribed prednisone, Flexeril, and tramadol. Wright also prescribed use of ice packs several times a day. R. 366-67.

On July 9, 2012, Davis saw her primary care physician Dr. Shawn Fry, M.D., for a medicine check. Davis reported numbness and tingling in her neck, arms and lower extremities. Davis indicated that she was still working and had pain in her lower extremities. On examination, Davis had decreased strength and numbness in her upper extremities. She had

decreased strength and decreased sensation in her lower extremities. Dr. Fry prescribed fentanyl patch for pain in addition to tramadol. R. 399-400.

On July 16, 2012, Davis had a CT scan of her cervical spine. The scan showed cervical spondylosis with hypertrophic spurs and facet hypertrophy, but no spinal stenosis. The scan showed C5-C6 disc space narrowing with spurs and foraminal stenosis. R. 415.

On July 26, 2012, Dr. Smucker performed EMG/nerve conduction studies on Davis. The testing showed mild bilateral median sensory neuropathy, and normal bilateral upper extremity testing with no evidence of cervical radiculopathy. R. 409.

On July 30, 2012, Davis saw Dr. Fry for a follow up. Dr. Fry and Davis had discussed pain management. Dr. Fry noted that Davis underwent back surgery by Dr. VanFleet, sought a second opinion from Dr. William Payne, M.D., and saw Dr. Smucker. Dr. Fry stated, "They are diagnosing this as failed back syndrome." Davis reported that she worked at a Dollar General Store unloading freight. Davis indicated her fentanyl patch did not stay on. She tried gabapentin without success. She said she had a spine stimulator, but it did not help with the pain. She said Tramadol and Vicodin did not provide relief. Dr. Fry stated that nerve conduction studies of Davis' cervical spine and lower extremities showed that she had

"no nerve damage per se but is having the nerve symptoms." Davis reported that she had been irritable with her children because of the pain. Dr. Fry stated that Davis needed to move to chronic narcotic use. Davis said she worked more than 40 hours a week and did not want medicine that would not allow her to function at work. R. 369.[2]

On examination, Dr. Fry observed an abnormal gait secondary to lower back pain. Davis had positive straight leg testing on the right. Davis reported more radicular symptoms on the left. Dr. Fry assessed lower back pain, prescribed oxycodone, and stopped the gabapentin. Dr. Fry stated that he would also "try her on a little Percocet to see how this works." R. 370.

On August 8, 2012, Davis saw Dr. VanFleet because she wanted her spinal stimulator removed. She reported that the stimulator was not effective. She said she had more pain now than before her back surgery. Dr. VanFleet said she had chronic pain syndrome. On examination, Davis had symmetric strength bilaterally. Dr. VanFleet indicated that there was no real reason to take the stimulator out and there were risks to the surgery to remove the stimulator. Davis said she would think about it and decide whether she wanted it removed. R. 499-500.

_____

[2] Dollar General Stores did not report paying any wages to Davis in 2012. See R. 224.

On August 2, 2012, Davis underwent a CT myleogram of her lumbar spine.  The scan showed postoperative changes and no evidence of neural compromise. R. 408.

On September 21, 2012, Davis saw Dr. Fry.  Davis reported continuing pain.  She stated that she was taking hydromorphone (Dilaudid) three times a day, but continued to have "a lot of pain."  Davis said she had constant pain at 8 or 9/10.  Dr. Fry noted that she did not "appear to be overly uncomfortable at this time."  Dr. Fry also noted, "I told her at this point, I do not feel comfortable with increasing her medication as it does not appear that she is in a significant amount of pain when she comes in, so we are going to refer her to the pain clinic to see if there is anything they could offer her at this time."  On examination, Davis walked with a slight limp.  Her neck was supple.  Dr. Fry referred Davis to the pain clinic.  R. 371.

On October 9, 2012, Davis saw Dr. Fry.  Davis reported that her pain seemed much better on her new prescriptions of cyclobenzaprine and hydromorphone.  Davis said that her lumbar pain was less intense with the new medications.  On examination of the lumbar spine, Davis' paraspinal muscles were "not as severely spasmed."  Davis had better range of motion in her lower extremities and hips.  She had positive straight leg

testing bilaterally. Dr. Fry assessed lumbar radiculopathy and continued Davis' current medications. R. 378-79.

On November 20, 2012, Davis saw Dr. VanFleet for a follow-up after the removal of the spinal stimulator. Dr. VanFleet stated that Davis was doing well. Davis had no complaints that this time. Dr. VanFleet said that Davis had no restrictions and could "exercise as she wishes." R. 498.

On January 23, 2013, Davis saw Dr. Fry. Davis said her back was locking up on her. Davis said she did not get relief from the medicine she tried. She said she was allergic to oxycodone. She reported that the Dilaudid was helping, but she felt very fatigued. Dr. Fry said she had chronic osteoarthritis and failed back syndrome. Dr. Fry suggested methadone for the pain. On examination, Davis had muscle spasms and tightness in her lower back muscles. Straight leg testing was positive bilaterally. She also had weakness in her extremities to palpation. Dr. Fry assessed lower back pain and cervical radiculopathy. Dr. Fry decreased the dosage of Dilaudid and added methadone to her medications. R. 386-87.

On February 28, 2013, Davis underwent a CT scan of her thoracic spine. The scan showed degenerative changes with spurs, but no acute

bony abnormality.  The scan showed electrodes in the spinal column from the stimulator.  R. 416

On August 21, 2013, Davis saw nurse practitioner King for back pain. R. 375-76.  Davis reported that methadone was not controlling her pain. She reported that the pain radiated down the right leg.  She said that she also sometimes had tingling in her arms.  On examination, Davis had positive straight leg lifts bilaterally.  Davis ambulated "with a fairly slow and easy gait."  King assessed cervicalgia, cervical radiculopathy, and lumbar radiculopathy.  King prescribed gabapentin.  R. 376.

On September 11, 2013, Davis saw Dr. Fry.  Davis reported continuing back and neck pain.  Dr. Fry stated that she had failed back syndrome.  Davis reported neck pain radiating into her upper extremities and numbness in her hands.  She reported that muscle spasms in her neck caused headaches.  On examination, Davis had muscle tenderness and/or muscle spasms in her sternocleidomastoid, trapezius, scalene, and occipital protuberance (inion) muscles.[3]  Her cervical spine showed weakness, and her upper extremities had reduced "motor power."  R. 389. Dr. Fry referred Davis for her neck and for an EMG/nerve conduction study of her cervical spine and upper extremities.  R. 389.

---

[3] These muscles are located in the shoulder, neck, and head.  Dorland's, at 1191-93, 1210, 1772.

On September 19, 2013, Davis saw orthopedic nurse practitioner Nichelson for neck pain. R. 458-59. Davis rated her pain at 6/10. Davis complained of pain, numbness, and tingling in her upper extremities and upper back. On examination, Davis had a normal heel-toe gait. She was also able to walk on her heels and her toes, although "a bit off-balance." R. 458. Her upper extremities were weak in all muscle groups. X-rays taken at the visit showed degeneration at C5-C6. Other levels of the cervical spine "do not look too bad." Nichelson assessed increasing neck and bilateral arm pain, mostly a C6 radicular pattern. R. 459.

On October 23, 2013, neurologist Dr. Claude Fortin, M.D., performed an EMG/nerve conduction study on Davis. The study showed bilateral moderate median neuropathies at the wrists, neuropraxic type with no axonal loss. Dr. Fortin said that the study suggested a "nonneurogenic etiology" for Davis' neck and scapular pain. Dr. Fortin said the intermittent hand numbness was "consistent with carpal tunnel syndrome corresponding with the median neuropathies evidenced above." R. 349.

On October 14, 2013, Davis underwent a CT myelogram of her cervical spine. The CT myelogram showed that the cervical alignment was intact with a slight straightening of the normal cervical lordosis, likely from positioning. The vertebral body heights were maintained with no evidence

of provertcoral soft tissue swelling.  The scan showed no fracture or subluxation and no paraspinal abnormality.  The impression from the scan was, "Mild degenerative changes.  Mild disc bulge with mild to moderate left neural foraminal encroachment at C5-C6."  R. 466.

On October 29, 2013, Davis saw surgeon Dr. Payne for a follow up on the EMG/nerve conduction study and CT scan.  Dr. Payne said that the scans showed carpal tunnel syndrome and left side foraminal stenosis at C5-C6.  Dr. Payne prescribed cockup wrist splints for the carpal tunnel syndrome and physical therapy for stretching and strengthening her cervical spine.  Dr. Payne opined that additional surgery would probably not help Davis' problems with her neck.  R. 461.

On October 30, 2013, Davis began a course of physical therapy.  She completed the course of therapy on November 25, 2013.  R. 545-70.  At the end of the therapy, Davis rated her cervical pain as 2/10 and her lumbar pain at 7/10.  Davis reported that her lumbar pain increased with standing, sitting, lifting, and cooking.  She stated that her cervical pain increased with driving, sitting, doing dishes, and gripping.  Davis reported severe limitations with sleeping; moderate limitations with dishes and household chores; and an inability to work.  R. 548.  On examination at the end of the course of therapy, the physical therapist observed improved, but still limited

range of motion in cervical and lumbar spine, and no significant improvement in strength. Davis' strength was in the range of 4/5 throughout, except for her abdominal muscles which remained at 1/5 at the beginning and completion of therapy. Straight leg testing was positive at the beginning and completion of therapy. R. 548.

On December 31, 2013, Davis saw nurse practitioner Nichelson for a follow up on her neck pain. Davis reported that she was "pretty much limited to staying in the house." Davis said she could not work. She said she weaned herself off pain medications. Davis wore splints at night for her carpal tunnel syndrome, although she took them off in the middle of the night. She reported some numbness in her hands. Nichelson assessed chronic neck and back pain, and carpal tunnel syndrome. Nichelson referred Davis for evaluation for carpal tunnel release surgery. Nichelson told Davis there was no sign of any significant stenosis in her neck. Nichelson told Davis to be as active as possible. Nichelson recommended yoga, Pilates, core strengthening exercises, and walking. R. 468-49.

On January 20, 2014, Davis saw Dr. Darr Leutz, M.D. for carpal tunnel syndrome. Davis reported pain, numbness, and tingling in her hands and wrists, but no radiocarpal pain, and no pain in the ulnacarpal joint. Davis had no swelling or weakness in her hands. Dr. Leutz ordered

physical therapy evaluation, home exercise, and follow up in six weeks.  R. 462-63.

On March 3, 2014, Davis saw Dr. Leutz for a follow up on her carpal tunnel syndrome.  Davis reported weakness in her grip and strength bilaterally, and tingling and numbness bilaterally.  Davis said she was doing about the same as the last appointment.  She stated that she did not have pain at that time in the right wrist joints, the radiocarpal joint, or the ulnocarpal joint.  Davis said that physical therapy helped.  On examination, Dr. Leutz assessed carpal tunnel syndrome.  R. 464.

On March 4, 2014, Davis saw Dr. VanFleet for back pain and leg pain.  On examination, Davis ambulated across the floor.  She had limited range of motion at the waist and symmetric range of motion in the hips and knees.  Her strength was 5/5.  X-rays showed the fusion at L4-5 and L5-S1 to be solid with no evidence of implant failure.  Dr. VanFleet assessed low back pain.  Dr. VanFleet recommended exercising and strengthening her core, which he said "might help her in the long term."  R. 495.

On March 11, 2014, Davis completed a Function Report—Adult form.  R. 255-63.  Davis stated, "I can't stand, bend, twist, even hardly walk.  I can only lift 7 pounds.  I can't sit or lay down for very long because of the pain."  R. 255.  Davis said she took care of her four children and one grandchild.

She said her children helped her dress because she could not bend.  She used a shower chair in the shower.  She had difficulty combing her hair because of cramps in her arms.  R. 256.

Davis said she prepared "complete meals with several courses" on a daily basis.  She spent one to two hours a day cooking.  She said she sat in a chair to cook and wash dishes.  She did the laundry with help every two weeks.  She said she went shopping for food, clothes, and household goods.  She said she had to "hold on to stuff" when she went out of the house by herself.  R. 257-58.

Davis stated that she could lift 7 pounds; she could not get back up from squatting, bending, or kneeling; and she could not stand or sit in a chair.  She said reaching hurt her neck.  She said she could not complete tasks because of the pain.  She said she could not climb stairs.  She said she could walk ½ a block before she had to rest for 15 minutes.  R. 260. She said that she used a cane and wheel chair.  She said a doctor prescribed wrist splints due to her carpal tunnel syndrome.  R. 261.

On March 19, 2014, Davis saw nurse practitioner King.  Davis reported that her left arm and leg felt weak, and her left leg "gives out."  On examination, her neck was supple and had normal range of motion.  Davis ambulated with a slight limp and "does not trust her left leg very well."

Davis reported that physical therapy did not help. King assessed worsening lumbar radiculopathy, cervical radiculopathy, and neuralgia. King prescribed Tramadol for pain. Davis said she did not want any narcotics because she did not want to be addicted. She said she was addicted before. King planned to refer Davis to Nichelson for injections for pain. R. 674.

On April 1, 2014, Davis saw Nichelson for a follow up of neck pain radiating into her left arm. Davis reported having problems with her balance and falling in the shower once. Davis also reported weakness in her arms, as well as worsening neck pain and headaches. On examination, Davis was negative for Hoffmann's reflex. She was generally weaker on her left side compared to her right. Her neck pain was worse with extension. Davis did not have pain with shoulder abduction bilaterally. Nichelson stated that the examination "was not terrible," and Davis' "balance was not terrible." Nichelson's said Davis' "gait issues are from her pain in her lower back." R. 672.

On April 23, 2014, state agency physician Dr. George Andrews, M.D., completed a Physical Residual Functional Capacity Assessment of Davis. Dr. Andrews opined that Davis could occasionally and frequently lift and carry 10 pounds, stand and/or walk for two hours in an eight-hour workday,

sit for six hours in an eight-hour workday, occasionally climb ladders, ropes, and scaffolds, occasionally balance, and frequently stoop.  Dr. Andrews opined that Davis had no other physical limitations to her functional capacity.  R. 132-33.

On May 13, 2014, Davis had a cervical CT myelogram.  The study showed interval progression of the C5-C6 central disc protrusion causing mild central canal stenosis with a new component of subarticular herniation.  The study also showed multilevel foraminal encroachment.  R. 615-16.

On May 20, 2014, Davis saw Dr. Payne for a follow up on the CT myelogram.  Dr. Payne stated that the CT showed significant central canal stenosis and bilateral forminal stenosis at C5-C6.  Dr. Payne recommended surgery.  In answer to a question from Davis, Dr. Payne said that cigarette smoking was "the number 1 link to spine problems and back pain degeneration, neck pain, etc."  Davis smoked cigarettes.  Dr. Payne also noted on examination that Davis had good motor strength in her upper extremities and she walked "with a normal heel-toe gait pattern." R. 664.

On June 11, 2014, Davis saw nurse practitioner Jane Piper, NP, for a cough and possible respiratory infection.  On examination, Davis showed symptoms of a sinus infection.  Piper also observed that Davis had normal

strength and normal range of motion.  Piper noted that Davis "Walks with a steady gait."  Piper prescribed medication for the sinus infection and ordered a chest x-ray.  R. 662.

On June 18, 2014, Davis saw nurse practitioner King for a pre-operative physical prior to the cervical spine surgery.  On examination, Davis had musculoskeletal abnormalities in her hands, cervical spine, and lumbar/lumbosacral spine.  Her motor strength was normal.  Her gait and stance were normal.  R. 659.

On June 25, 2014, Dr. Payne performed an anterior discectomy and fusion at C5-C6 of Davis' cervical spine.  R. 601-03.

On July 9, 2014, Davis saw Dr. Fortin for headaches and occipital pain.  Davis reported headaches two to three times a week with photophobia, phono phobia, nausea, and occasional vomiting. The pain extended into her jaw, ear, and occiput.  Davis reported significant improvement in her arm and neck pain after her neck surgery.  On examination, Dr. Fortin found no occipital point or trapezii tenderness on palpation.  Davis' range of motion in her neck was limited.  Her strength was 5/5 in both upper extremities.  She walked with a limp, but did not use

an assistive device to ambulate. Romberg stance was negative.[4] R. 652-53. Dr. Fortin diagnosed chronic neck pain status post surgery, lower back pain with failed surgery and radiation into the left leg, and intermittent headache, "likely migrainous." R. 652-53.

On July 24, 2014, Davis saw Dr. Payne for a follow up. Davis reported that she fell and was having left arm pain, numbness, and tingling. Davis said her leg gave out. Davis indicated her left arm was weak, achy, and burning, but her right arm was not as bad. Davis told Dr. Payne she felt a crunch in her neck. X-rays taken at the visit "look great of the neck." Davis' voice and swallowing were normal. Davis had 5/5 grip in her right upper extremities. R. 648.

On August 14, 2014, Davis saw Dr. Payne for a follow up. Davis reported that the numbness and tingling in her arms was not any better. Dr. Payne stated that the x-rays of her neck "look great." Dr. Payne did not understand why her numbness and tingling in her arms and hands was not improving. Dr. Payne recommended that Dr. Fortin repeat the EMG/nerve conduction studies of her wrists. R. 646.

---

[4] Romberg stance is a test for balance. The person stands with feet close together and eyes closed. Dorland's, at 1715 (under Romberg's sign).

On October 8, 2014, Dr. Fortin performed an EMG/nerve conduction study of her wrists.  The study showed bilateral moderate median neuropathies of the wrist, neurapraxic in nature without axon loss.  No evidence of alternate neurogenic lesion including cervical neuropathy.  R. 643.

On October 29, 2014, Davis saw nurse practitioner Chris Carver for a follow up on her low back pain and headaches.  Davis said that her left leg was weak, which caused two falls.  She said she had one to two headaches per month and her headaches were stable.  She said "topiramate has made a huge difference in the frequency and severity of her headaches."  She was pleased with the progress of her headaches.  R. 638.  On examination, Davis muscle bulk and tone were normal, her strength was 5/5 in her upper and lower extremities, and her gait was steady. Carver renewed her prescription for Topiramate.  R. 639-40.

On November 12, 2014, Davis saw Dr. Leutz for carpal tunnel syndrome.  Davis reported pain in her right wrist, weak grip, weakness in her hands, numbness, and tingling bilaterally.  Davis said she was doing worse since her last appointment with Dr. Leutz. She said that her left wrist was worse.  She rated her pain as 5/10 and described the pain as sharp and aching.  R. 633.  On examination, Phalen's maneuver and Tinel's signs

were positive, and Davis' strength in her fingers and hands was 3/5.[5]  Dr.

Leutz recommended carpal tunnel release surgery for decompression of

median nerve.  R. 634.

On November 28, 2014, Dr. Leutz performed carpal tunnel release

surgery on Davis' left wrist.  R. 679.

On November 19, 2014, Davis completed a Function Report—Adult

Form.  R. 283-90.  The report was substantially similar to the March 11,

2014 Report.  She again opined that she could not lift more than 7 pounds,

could only walk ½ a block before she had to rest.  She said this time that

she had to rest 30 minutes before resuming activity.  R. 288.  She said, "I

can only sit for 1 or 2 hrs then have to get up.  I have a Recliner."  R. 288.

She said she had a fear of falling and hurting herself.  R. 289.

On December 11, 2014, Davis saw Dr. Leutz for a follow up.  Davis

reported that she was "100% improved and her pain level is 0/10."  R. 627.

Dr. Leutz ordered home exercises.  R. 628.

On December 30, 2014, state agency physician Dr. David Mack,

M.D., completed a Physical Residual Functional Capacity Assessment of

Davis.  R. 142-44.  Dr. Mack opined that Davis could:  occasionally lift 10

---

[5] Phalen's maneuver and Tinel's sign are tests for carpal tunnel syndrome.  In Phalen's maneuver, the wrist is held fully flexed or extended for 30 to 60 seconds.  The test is positive if the person feels numbness in the hand.  Tinel's sign is tingling in the hand when the inside of the wrist is tapped.  See Dorland's, at 1714, 1716, 1986.

pounds and frequently lift less than 10 pounds; stand and/or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. R. 143-44. In citing the basis for his opinions, Dr. Mack included Davis' statement to Dr. Leutz on December 11, 2014 statement that her carpal tunnel syndrome was "100 % improved and her pain level was 0/10." R. 144.

On June 2, 2015, Davis saw Dr. Payne for a one-year follow up on the cervical spine surgery. Dr. Payne stated, "Her x-rays look wonderful. Her scar has healed up very nicely." Davis reported that she got "some achiness at the cervicothoracic junction from time to time, especially if she drives for long distances, but she just stretches her neck side to side, and it goes away." Dr. Payne said, "She really does not have any concerns about her neck. She is happy how it turned out." R. 719. On examination, Davis walked with a heel-toe gait. She had normal strength in all motor groups in her upper extremities. Dr. Payne released her from care. R. 719.

On July 9, 2015, Davis saw Dr. Fortin for a follow up on her migraine headaches. Davis reported that she was not having headaches. Dr. Fortin stated, "She is tolerating her topiramate which is controlling her headaches." R. 722. On examination, Davis' strength was 5/5 throughout.

Dr. Fortin stopped the topiramate to see if the cervical spine surgery effectively resolved her headache problems. R. 723.

THE EVIDENTIARY HEARING

On January 12, 2016, the ALJ conducted an evidentiary hearing. R. 33-70. Davis appeared with her attorney. Vocational Expert, Dr. James Lanier, Ph.D., also appeared. R. 35.

Davis testified. She said she lived in a house with her boyfriend and her four children, ages 23, 15, and two 13-year old twins. Davis' boyfriend and 23-year old child worked outside the home. R. 39. Davis stated that when her younger children came home from school, she sometimes sat in a recliner and tried to help them with their homework. Other times, the children played outside. She sometimes sat in a porch swing and watched the children play. She did not participate with the children because she was in too much pain. She could sit in the porch swing about 30 minutes. She walked around when she got up from the porch swing. R. 40-41.

Davis said she sat in a recliner when the children were not home. She watched television. Sometimes she used a computer tablet. R. 43. Davis sat in her recliner for 30 to 45 minutes and then got up to walk around or go back to bed because of the pain. R. 56. Davis said, "Mostly, I

just lay around and then sit in the recliner. And I take a couple of naps during the day and – before the kids come home from school." R. 43.

Davis indicated she did not eat breakfast or lunch, but ate supper. She cooked supper for her family. She said that she could stand and cook for about 30 to 45 minutes, but then she had to sit down because of the pain. R. 43-44. Her 23-year old daughter would sometimes take over the cooking to complete the meal. Davis stated that her son did the yardwork and took care of the dogs. She said her younger daughter vacuumed and cleaned the house. R. 58.

Davis testified that she drove sometimes. She said that the pain in her back kept her from driving much. She also said that she could not turn her head because of her neck. Davis said that after her surgery, she could not turn her head. R. 44. Davis said that the trouble turning her head was supposed to correct itself after a while. R. 45.

Davis agreed that she tried to go to her children's school activities. She said she could not sit for more than 30 minutes, and then she had to walk around. She had trouble getting up from sitting on bleachers. R. 47-48.

Davis said she went grocery shopping three times a month.  She sometimes rode in a self-propelled cart in the grocery store when she shopped.  R. 50.

Davis sat in a shower chair when she showered.  She said her eldest daughter helped her shave her legs. R. 50.  Davis indicated she had pain in her arms, shoulder, and neck when she brushed her teeth.  She said she also experienced pain in her right arm and hand when she combed her hair and drove a car.  She had trouble gripping the steering wheel with her right hand.  R. 58-59.

Davis said that she did not go anywhere for entertainment or leisure.  She tried to go fishing with her children, but could not.  She said she had too much pain in her back from either sitting or standing.  R. 50.

Davis worked for a hospital in the kitchen for 12 years. R. 52.   She was a head cook and then an assistant cook.  R. 57.  She left in 2011 because she had too much pain and could not lift anything.  She could not work a full shift because of the pain.  She had to lift heavy objects as a cook, such as heavy pots and pans and equipment like meat slicers.  She said she lifted objects that weighed 50 to 100 pounds.  She also had to stand for long periods as a cook and had to clean her work area.  R. 52-53.  Davis did not look for other work because she was in too much pain. R. 6.

Davis said she did not look for other work because she did not know anything else. She only cooked and took care of people. She also said that she could not work an eight-hour workday because of the pain. She testified at the time of the hearing, she could not work because of her back pain. R. 56. Davis had pain in her lower back that radiated to her hips and her left leg. R. 57. She said Dr. Payne and VanFleet said they could not do anything surgically for her pain. R. 58, 60. Epidural injections did not help with the pain. R. 61. The spinal stimulator did not work, so she had it removed. R. 64.

Davis said she tried to exercise, but could not because of the pain. She could not exercise as Dr. VanFleet recommended because of the pain. She said she did not walk, except at the grocery store, because of the pain. R. 63.

Davis indicated her neck surgery helped the left side of her neck, but not the right. She had numbness, tingling, and burning pain on the right side of her neck sometimes. R. 58. Davis said that the neck surgery resolved her headaches. R. 59. Davis noted that her carpal tunnel release surgery helped with her hands. She said that she could lift more and had more grip strength. She still had trouble stirring sometimes. R. 60.

Vocational expert Dr. Lanier testified.  The ALJ asked Dr. Lanier a

hypothetical question:

> Q     All right. All right. Then I'd ask you to, please, assume
> someone with her -- a hypothetical someone with the claimant's
> age and education with those past jobs that you have
> described. We are going to assume for purposes of this
> hypothetical that she can lift occasionally ten pounds, frequently
> less than ten pounds, carry the same – that she could sit for a
> total of six hours in an eight-hour day. She can stand and/or
> walk a total of two hours in an eight-hour day. Push and pull
> would be the same as lift, carry.  She should only occasionally
> climb ramps and stairs, never ladders and scaffolds. She could
> occasionally balance, stoop, kneel, crouch, and crawl. Now,
> can that hypothetical person perform her past work?

R. 67.  Dr. Lanier opined that such a person could not perform Davis' past

relevant work.  Dr. Lanier also opined that such a person could perform

other jobs, including addresser, with 500 such jobs in Illinois and 18,829

nationally; and document preparer, with 3,248 such jobs in Illinois and

66,430 nationally.  Dr. Lanier stated that these jobs would allow an at-will

option to sit or stand.  Dr. Lanier said that these jobs required the ability to

handle and finger objects frequently.  R. 67-68.  Dr. Lanier opined that the

person described in the hypothetical question could not work if she was

limited to handling objects occasionally.  R. 68.

Dr. Lanier additionally opined that a person in the jobs he identified

could be absent from work one to one and one-half days per month, and

needed to be on-task 95 percent of the workday.  R. 68.  Dr. Lanier said the

person would be terminated eventually if she took additional, unscheduled breaks during worktime at least three to four times a week. R. 69. The hearing then ended.

## THE DECISION OF THE ALJ

The ALJ issued her decision on March 24, 2016. R. 17-26. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If

the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Davis met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since September 30, 2013. She suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine; carpal tunnel syndrome, status post-release surgery; and osteoarthritis. R. 20.

The ALJ found at Step 3, that Davis' condition did not meet a Listing. R. 21-22. The ALJ considered the Listing 1.04 for disorders of the spine. R. 21. Listing 1.04 requires that a person's condition meet or medically equal the following:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04.[6] Ineffective ambulation means:

Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing

---

[6] Arachnoiditis is pain caused inflammation of the arachnoid membrane surrounding nerves in the spinal cord. Pseudoclaudication occurs when the areas in the spinal column through which the nerves to the lower extremities become too narrow and put pressure on the nerve roots. See Memorandum in Support of the Commissioner's Decision (d/e 20), at 11, n. 3 and n. 4 (definitions of arachnoiditis and pseudoclaudication.

1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

Listing 1.00B1.

Effective ambulation means:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00B2.  Muscle atrophy must be determined by detailed

measurements of size and strength:

> [A] report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of both thighs and lower legs, or both upper and lower arms, as appropriate, at a stated point above and below the knee or elbow given in inches or centimeters. Additionally, a report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength.

Listing 1.00E.1.

The ALJ found that Davis' condition did not meet Listing 1.04A because the ALJ found that the EMG/nerve conduction studies did not show nerve damage.  R. 21.  The ALJ relied on Dr. Fry's July 30, 2012, examination note that stated that nerve conduction studies of her cervical and lower extremities did not show nerve damage.  R. 369.  The ALJ also cited the July 26, 2012 EMG/nerve conduction study of Davis' upper extremities.  R. 409-310.  The ALJ also found improved range of motion in her lower extremities that did not suggest nerve root compression.  R. 21. The ALJ relied on Dr. Fry's October 9, 2012 examination note that stated Davis had improved range of motion in her lower extremities.  R. 378.

The ALJ found that Davis' condition did not meet Listing 1.04C because the examination records showed that Davis could ambulate effectively.  R. 21.  The ALJ relied on examination notes from: (1) Nichelson on September 19, 2013 that Davis had a normal heel-toe gait, and could heel walk and toe walk although a little off-balance (R.  458); (2) King on June 18, 2014, that Davis' gait and stance were normal; and (3) Piper on June 11, 2014, that Davis' gait was steady.  R. 458, 659, 662. The ALJ also found that the records showed no arachnoiditis or lumbar spinal stenosis with pseudoclaudication.  R. 21.  The ALJ relied on Nichelson's

June 25, 2010, treatment note in which she stated that Davis' imaging studies did not show significant nerve impingement or stenosis.  R. 456.

At Step 4, the ALJ found that after September 30, 2013, Davis had the following RFC:

> As of September 30, 2013 through the date of this decision, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift or carry, push or pull up to ten pounds occasionally and less than ten pounds frequently.  She can sit up to six hours in an eight-hour day, and can stand or walk up to two hours in an eight-hour day. She cannot climb ladders, ropes or scaffolds. She can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. She can also frequently finger and handle bilaterally.

R. 22.  The ALJ relied on the opinions of Dr. Andrews and Mack, as well as physical examination notes that showed that she had full strength in all her extremities.  The ALJ relied on Davis' statement to Dr. Payne that her neck surgery was successful and the fact that Dr. VanFleet recommended that Davis exercise and remain active.  The ALJ found "The claimant's testimony and subjective complaints exceed the clinical examination findings, however the objective findings fully support the claimant can perform sedentary work."  R. 23.  The ALJ also stated that Davis' daily activities supported the RFC finding.  The ALJ noted that Davis reported in her Function Report that she cooked full course meals daily, helped her children with their homework, drove and grocery shopped three times a

month, and washed dishes while seated.  The ALJ also relied on the successful results of both Davis' carpal tunnel release surgery and cervical spine surgery.  R. 24-25.

The ALJ gave physical therapist Thorsen's opinions limited weight because he based his opinions on Davis' subjective complaints and because he was not a medically acceptable source.  R. 25.

The ALJ summarized the basis for her RFC finding:

> In conclusion, the undersigned finds the above residual functional capacity assessment is supported by the record when considered as a whole.  The undersigned has considered the reports of the state agency medical consultants as well as other treating, examining, and non-examining medical sources. The undersigned has also considered the medical records or lack thereof, the claimant's previous work or lack thereof, the claimant's activities of daily living, and the hearing testimony. The undersigned finds that the claimant's limitations are not fully disabling and that the claimant retains the capacity to perform work activities with the limitations set forth above.

R. 26.

At Step 4, the ALJ found that Davis could not return to her past relevant work.  R. 26.  At Step 5, the ALJ found that Davis could perform a significant number of jobs in the national economy.  The ALJ considered the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P Appendix 2, and the opinions of Dr. Lanier, that a person with Davis' age, education, work experience, and RFC could perform representative sedentary jobs of

addresser and document preparer.  R. 27.  The ALJ concluded that Davis was not disabled.

Davis appealed.  On July 11, 2017, the Appeals Council denied Davis' Request for Review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Davis then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The determination that Davis' condition did not meet or equal Listing 1.04 was supported by substantial evidence.  Dr. Fry stated that nerve conduction studies of the lower extremities did not show nerve damage.  No post-operative pathology or imaging documented arachnoiditis or dysesthesia, and repeated examinations by nurse practitioners and physicians noted that Davis could ambulate effectively, as that term is defined in Listing 1.00B, i.e., she did not need to use two assistive devices to walk.  No examination documented any muscle atrophy.

The RFC finding was supported by the opinions of Drs. Andrews and Mack, the successful results from the cervical spine surgery and the carpal tunnel surgery, and the examinations that found good strength and range of motion in Davis' extremities.  Davis' Function Report – Adult form listed daily activities that were consistent with the RFC finding.  Substantial

evidence in the record also supported the ALJ's decision to discount Thorsen's opinions.  Thorsen is not an acceptable medical source.  See 20 C.F.R. § 404.1502(a).  Thorsen's report was based, in part, on Davis' subjective reports to him.  Thorsen's opinions were inconsistent with Drs. Andrews and Mack's opinions. The ALJ properly weighed the evidence and gave greater weight to the doctors' opinions.

The RFC, along with the opinions of Dr. Lanier, supported the decision at Step 5 that Davis could perform a significant number of jobs in the national economy.

Davis argues that substantial evidence did not support the ALJ's findings that she did not meet Listing 1.04 for disorders of the spine. Listing 1.04A, quoted above, requires (1) nerve root compression with resulting pain and limitation in range of motion in the spine, (2) "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," and (3) positive straight leg testing. That Listing is very specific.  Davis must present evidence to show that she met every specific requirement.  See e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

Davis argues that Dr. Fry's July 30, 2012, note did not support the ALJ's statement that the evidence did not show nerve root compression.

She notes that the ALJ erroneously cited a nerve conduction study of the upper extremities. That was error. This study related to Davis' carpal tunnel syndrome in her wrists, not her lumbar spine problems. Davis argues that the ALJ also erred by not addressing Dr. Fry's additional statements about her lumbar spinal condition in the July 30, 2012 examination note, and further, erred by relying on Nichelson's examination note from 2010 to support a finding of no showing of a nerve root compression. Davis argues that the 2010 examination note concerned an examination that occurred too long before the onset date of September 30, 2013 to have probative value. The Court agrees that evidence from 2010 is remote and that Dr. Fry's other comments on July 30, 2012 were relevant to limitations caused by back pain. Davis argues that she met or equaled Listing 1.04A and/or Listing 1.04C, quoted above.

The ALJ's error or errors in determining whether Davis met or equaled Listing 1.04A or 1.04C, however, were harmless. An error is harmless if it would not affect the outcome. See Spiva v. Astrue, 628 F.3d 346, 353 97th Cir. 2010). The ALJ's errors would not have affected the conclusion that Davis' condition did not meet or equal Listing 1.04A or 1.04C.

Listing 1.04A requires as follows: (1) nerve root compression with resulting pain and limitation in range of motion in the spine, (2) "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," and (3) positive straight leg testing. Davis has cited evidence of degenerative disease in her lumbar spine resulting in pain and loss of range of motion, and positive straight leg testing. She has not, however, cited evidence of motor loss resulting in atrophy and sensory reflex loss. Furthermore, atrophy must be documented by measurements of muscle size and strength. Listing 1.00E.1, quoted above. Davis exhaustively reviewed the medical records, but did not cite to any such measurements. Without this evidence, a remand would not change the result. Even if the ALJ corrected her errors in this part of her opinion, she would still have found that Davis' condition did not meet or equal Listing 1.04A.

Listing 1.04C requires as follows: (1) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, (2) manifested by chronic nonradicular pain and weakness, and (3) resulting in inability to ambulate effectively. Apart from the lack of evidence of spinal stenosis, every medical professional who recorded observations of Davis' ability to ambulate cited by the parties, said

she could ambulate effectively.  See R. 456-57, R. 376, R. 459, R. 495, R. 674, R. 664, R. 662, R. 659, R. 652-53.R. 639-40, R. 719.  Some said she walked with a limp, some said her gait was slow or steady, but all said she could walk without needing two assistive devices.  All said she could ambulate effectively.

Davis complains that medical professionals made some of these observations in the course of examining some unrelated condition, such as pain in her cervical spine.  She argues that the ALJ should not rely on those observations.  The Court disagrees.  In each case, a qualified physician or nurse practitioner conducted a physical examination.  In the course of the examination, the physician or nurse practitioner observed and documented Davis' gait.  Those observations are competent evidence of her ability to ambulate.[7]  The ALJ determined the weight to give the observations.  The Court will not reweigh the evidence.  The ALJ also did not "cherry pick" the notes that supported her analysis while ignoring contrary evidence.  See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).  All the evidence showed that Davis could walk without needing to use two assistive devices.

---

[7] The nurse practitioners were not acceptable medical sources, but their observations were competent evidence from trained medical personnel.  See 20 C.F.R. § 1527(f); SSR 06-03p.

Davis could ambulate effectively for purposes of Listing 1.04C. She did not meet or equal Listing 1.04C. Any claimed failures by the ALJ would not have affected the outcome. The Court will not reverse the ALJ's decision that Davis' condition did not meet or Listing 1.04.

Davis also argues that the ALJ erred in giving little weight to physical therapist Thorsen's opinions. The Court again disagrees. The ALJ noted that at least part of his report was based on Davis' subjective statements. The ALJ also noted Thorsen is not an acceptable medical source and his opinions conflicted with the opinions of Drs. Andrews and Mack. See 20 C.F.R. § 404.1502; SSR 06-03p. The ALJ considered the source and quality of the conflicting opinions and gave Thorsen's opinions less weight. The Court will not reweigh the evidence. See Jens, 347 F.3d at 212. There was no error.

Davis complains that the ALJ violated SSR 16-3p by not adequately considering Davis' testimony about the limiting effects of her pain. The Social Security Administration directed ALJs in SSR 16-3p to no longer assess the claimant's credibility. The Social Security Administration explained that the ALJ should not assess the claimant's truthfulness,

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not

be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms . . . .

Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claim, as amended, 2017 WL 5180304, at *11 (October 25, 2017) (SSR 16-3p).  Rather, the ALJs must assess the testimony about the limiting effects of symptoms in light of all the evidence, including the medical evidence.  The Social Security Administration explained,

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2017 WL 5180304, at *8.

In this case, the ALJ found that Davis' statements about the limiting effects of her symptoms were inconsistent with the medical evidence.  For example, Davis testified that she had significant problems with the right side of her neck and with turning her neck after her cervical spine surgery. The ALJ, however, observed that she could move her head to the right at the hearing without difficulty.  The ALJ further noted Dr. Payne's medical

notes that stated that the x-rays "looked wonderful" and Davis told Dr.

Payne she no longer had any problems with her neck.  R. 719.  The ALJ

weighed the inconsistent and contradictory evidence and determined Davis

had the ability to perform a limited range of sedentary work. The Court will

not reweigh the conflicting evidence.

The ALJ further did not improperly rule on Davis' credibility or

truthfulness.  The ALJ also did not dismiss Davis' testimony because she

did not present objective evidence of the functional limitations from her pain

symptoms.  Rather, the ALJ weighed the conflicting evidence, including

Davis' testimony and the medical evidence, and made findings on all the

evidence.   There was no error.

Davis complains that the ALJ improperly discredited her testimony

based on her daily activities.  The Court again disagrees.  The ALJ cannot

rely on a claimant's daily activities alone to establish an ability to function in

a work environment.  See Clifford, 227 F.3d at 872.  The Social Security

regulations, however, require ALJs to consider a claimant's daily activities

along with other relevant evidence.  20 C.F.R. § 1529(c)(3).  The ALJ must

then weigh all the relevant material evidence in the file to make a

determination of a claimant's functional limitations.  The ALJ did so here.

The ALJ considered all the relevant evidence, including Davis' testimony,

Davis' Function Report—Adult forms, Davis' behavior at the hearing, Davis' medical treatment records, and the opinions of Drs. Andrews and Mack. The ALJ did not simply rely on Davis' daily activities. There was no error.

Finally, Davis argues that the ALJ erred by not awarding her a closed period of disability for the 2014 calendar year. Davis' attorney mentioned at the beginning of the evidentiary hearing that Davis had 25 medical appointments during the calendar year 2014. Dr. Lanier opined that a person such as Davis could not maintain employment if she had to be absent from work more than one and one-half days per month. Davis argues that she would have been absent over two days per month, on average, due to medical appointments. Davis argues that the ALJ erred in not considering Davis was unable to work in 2014 because her impairments would have required her to be absent too many times due to her medical appointments.

The ALJ is required to articulate minimally her analysis of the material relevant evidence. Herron, 19 F.3d at 333. The ALJ is not required to speculate. Davis is speculating on what she would have done had she been working in 2014. If Davis had been working, she might have scheduled her medical appointments on her days off or combined appointments. No one knows. No one knows because this argument is all

speculation. The ALJ did not err in omitting such speculation from her decision.[8] If numbers of doctors' visits alone could establish disability, claimants would only need to schedule enough visits. See Hoppa v. Colvin, 2013 WL 5874639, at *5 (W.D. Wis. October 31, 2013). The Court will not reverse the ALJ's decision based on Davis' speculation.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 19) is ALLOWED, and Davis' Motion for Summary Judgment (d/e 14) is DENIED. The decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER: September 13, 2018

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE

---

[8] A claimant's condition may require repeated, time-consuming medical procedures that could reasonably be expected to require regular absences from work. See e.g., Gille v. Colvin, 2016 WL 1125819, at 13 (C.D. Ill. February 22, 2016) (Claimant's condition required a doctor to debride necrotic tissue under local anesthesia once every three weeks in order to be able to work). Davis did not present evidence of required regularly scheduled, time-consuming medical treatments.